# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GREENSTAR IH REP, LLC and )
GARY SEGAL, )
          )
         Plaintiffs, )
         )
         v. )     **C.A. No. 12885-VCS**
         )
TUTOR PERINI CORPORATION, )
         )
         Defendant. )
TUTOR PERINI CORPORATION, )
         )
         Counterclaimant, )
         )
         v. )
         )
GARY SEGAL, )
         )
         Counterclaim-Defendant. )

## MEMORANDUM OPINION

Date Submitted:  September 10, 2019
Date Decided: December 4, 2019

Kenneth J. Nachbar, Esquire and Lauren Neal Bennett, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Ira Lee Sorkin, Esquire, Amit Sondhi, Esquire, Kevin M. Brown, Esquire and Michael Meyers, Esquire of Mintz & Gold LLP, New York, New York, Attorneys for Plaintiffs Greenstar IH Rep, LLC and Gary Segal and Counterclaim Defendant Gary Segal.

Brian C. Ralston, Esquire and Aaron R. Sims, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Robert Nida, Esquire and Matthew J. Luce, Esquire of Nida & Romyn, P.C., Beverly Hills, California, Attorneys for Defendant/Counterclaimant Tutor Perini Corporation.

**SLIGHTS, Vice Chancellor**

On July 1, 2011, two construction companies, Tutor Perini Corporation and Greenstar Services Corporation, among others, signed an Agreement and Plan of Merger (the "Merger Agreement") whereby Greenstar became a wholly-owned subsidiary of Tutor Perini. During negotiations, Tutor Perini questioned whether Greenstar had overestimated the amount of cash it would eventually collect from its customers. To address this concern, the parties agreed to several so-called "holdback provisions" tied to Greenstar's post-closing cash collections. These provisions called for the sellers to receive additional consideration if Greenstar achieved certain cash collection milestones post-closing.

As they are wont to do, the contingent consideration provisions prompted post-closing disagreements. The sellers claimed Greenstar had collected enough to mandate release of the holdbacks; Tutor Perini disagreed and refused to release the holdback funds. After much back and forth, the parties agreed to resolve their dispute by modifying the Merger Agreement's holdback provisions, as memorialized in a May 3, 2013, Holdback Settlement and Release Agreement (the "Holdback Agreement").

While intended to provide clarity, the Holdback Agreement did no such thing. The parties were soon back at square one—disputing whether the sellers were owed holdback funds, this time under the Holdback Agreement. That dispute led to this litigation. According to the sellers, they are owed $8 million in holdback payments.

1

Tutor Perini maintains the sellers are owed nothing. The Court convened a trial and this is the Court's post-trial decision.

At the threshold, the parties do not agree how the Holdback Agreement is meant to work. They have offered competing constructions of key terms. While certain of the contract's provisions are not models of clarity, the parties took the extra step of providing an explanation of how they intended the contract to operate given a hypothetical set of collections by Greenstar in its post-closing operations. This explanation was incorporated into the Holdback Agreement and provides useful insight into the parties' intent.

Delaware law requires that our courts read all elements of an integrated contract together when undertaking to construe the contract as a matter of law. With this canon in mind, I am satisfied that Greenstar has achieved the collection milestones that trigger the holdback payments, all as provided by the Holdback Agreement with its incorporated examples. Judgment will be entered for the sellers in the amount of $8 million.

## I. BACKGROUND

The Court held a three-day trial during which it heard live testimony from 7 witnesses and received over 451 trial exhibits along with the lodged deposition

testimony of 14 witness.[1] I have drawn the facts from the stipulations of fact entered before trial, the testimony and exhibits presented during trial and from reasonable inferences that flow from that evidence.[2] The following facts were proven by a preponderance of the evidence.

## A. Parties and Relevant Non-Parties

Plaintiff, Greenstar IH Rep, LLC ("IH Rep"), is a Delaware Limited Liability Company.[3] The Merger Agreement names IH Rep as the "Interest Holder Representative"—meaning it holds the sellers' post-closing rights and, if owed, will receive the holdback payments on their behalf.[4]

Plaintiff, Gary Segal, is the former CEO of both Greenstar and Five Star Electric Corporation.[5] Segal's father formed Five Star in 1959, and Segal joined the firm in 1981.[6] Upon his father's death in 1991, Segal became Five Star's president

---

[1] Witness and Ex. List (D.I. 207).

[2] Citations will appear as follows: "PTO __" will refer to stipulated facts in the pre-trial order; "Tr. __ ([Name])" will refer to witness testimony from the trial transcript; "JX __" will refer to the trial exhibits; and "([Name]) Dep. __ (D.I. __)" will refer to witness testimony from a deposition transcript lodged with the Court for trial.

[3] PTO § III.A.1 (D.I. 170).

[4] *Id.*; JX 12 (the "Merger Agreement") § 5.02.

[5] PTO § III.A.2.

[6] Tr. 4:8–10 (Segal).

and sole owner.[7] After assuming leadership, Segal went on to shepherd Five Star into a period of sustained growth.[8] Segal is one of the identified "stockholders" (or sellers) in the Merger Agreement.[9]

Non-party, Greenstar, wholly-owns the stock of Five Star and WDF, Inc.[10] Five Star is an electrical contractor and WDF is a mechanical and plumbing contractor.[11] Non-party, Larry Roman, is WDF's CEO.[12] He is also one of the identified sellers in the Merger Agreement.

Around 2008, Roman and Segal noticed their respective companies (WDF and Five Star) were subcontractors on many of the same jobs with Five Star handling the electrical work and WDF handling the plumbing.[13] Accordingly, they decided to combine their two firms to form Greenstar, a "turnkey" solution offering mechanical, electrical, plumbing and sprinkler contracting services "all in one."[14]

---

[7] Tr. 5–6, 9:3–5 (Segal).

[8] *Id.* at 6–9.

[9] *Id.* at 9–10. *See also* Merger Agreement §§ 1.01, 2.08(c)(i).

[10] *Id.* at 8–9; PTO § III.B.4.

[11] PTO § III.B.4.

[12] Tr. 337:3–5 (Soroka).

[13] Tr. 7–8 (Segal).

[14] *Id.* at 8.

4

Defendant, Tutor Perini, is a publicly traded Massachusetts corporation with its principal place of business in Sylmar, California.[15]  Non-party, Ronald Tutor, is the Chairman and CEO of Tutor Perini.[16]

### B. Tutor Perini Acquires Greenstar

In 2011, Greenstar and Tutor Perini began negotiations for Tutor Perini to acquire Greenstar, along with its subsidiaries—Five Star and WDF.[17]  Greenstar was attractive to Tutor Perini because it furthered its strategy to integrate its business vertically by acquiring specialty contractors, particularly in the New York market.[18]

Following negotiations between the parties, Tutor Perini, Greenstar, a merger subsidiary and IH Rep executed the Merger Agreement.[19]  Greenstar became a wholly-owned subsidiary of Tutor Perini, and the sellers, as identified in the Merger Agreement (the "Sellers"), collectively received $208 million.[20]  The Merger Agreement computed the purchase price by adding Greenstar's "book value" of

---

[15] PTO § I.A.3.

[16] *Id.*

[17] Tr. 10 (Segal); Tr. 388 (Tutor).

[18] Tr. 438–39 (Tutor); Tutor Dep. 14:7–19 (D.I. 165).

[19] Merger Agreement at 20 (recitals).

[20] *Id.*; Tr. 10 (Segal).

5

$175 million to a "kicker" of $33.5 million.[21] Per the Merger Agreement, the deal consideration was divided into a cash payment at closing, an earn-out and multiple escrow holdbacks.[22]

At closing, Greenstar's $175 million book value included an asset representing its estimated future cash collections (or "CIE," as further defined below).[23] Because Tutor Perini valued Greenstar based on its book value, Tutor Perini required Greenstar to disclose its CIE on schedules and to represent that the CIE would eventually be collected from its customers.[24]

Throughout the parties' negotiations, Tutor Perini expressed concerns about whether much of Greenstar's CIE was actually collectible.[25] These concerns led

---

[21] Tr. 10 (Segal). If Greenstar's closing net worth exceeded or fell below a $140 million target, the Merger Agreement provided that the purchase price would be adjusted. Merger Agreement §§ 1.01 (definitions of Estimated Negative Net Worth Adjustment and Estimated Positive Net Worth Adjustment), 2.13 (entitled "Closing Net Worth Adjustment"). Greenstar's closing net worth was almost $174 million at closing. Merger Agreement § 2.13. As a result, with the kicker, the adjusted purchase price was around $208 million. Tr. 10:13–17 (Segal).

[22] Tr. 89–90 (Tutor); Tr. 627–28 (Burk).

[23] Merger Agreement § 6.08; JX 33; Tr. 10–17 (Segal) (explaining construction accounting terms); Tr. 596 (Bennett) (purchase price was based on book value which included CIE).

[24] Merger Agreement §§ 6.08, 6.09; Tutor Dep. at 37:6–39:7 (D.I. 165); Tr. 466–68 (Tutor). The disclosure letter associated with the Merger Agreement showed $34.2 million in pending change orders and claims that Greenstar had booked as revenue (increasing Greenstar's book value) as of the Merger Agreement. JX 13 at 14.

[25] Tutor Dep. 19:20–21:17 (D.I. 165); JX 273; Tr. 389–91 (Tutor).

Tutor Perini to insist on two escrow holdbacks in the Merger Agreement, a $17.5 million Indemnity Holdback and an $8 million Special Holdback.[26] The parties structured the holdbacks to incentivize cash collections and ensure that Tutor Perini received the benefit of the assets it "paid for" in the Merger Agreement.[27] This incentive structure made particular sense to the parties since Segal and Roman were to continue as Five Star and WDF's CEOs, respectively, after the merger.[28] As beneficiaries of the holdback payments, they were both incentivized to pursue cash collections with vigor.

Under the holdback structure, if Greenstar's subsidiaries failed to reach the CIE targets listed on Greenstar's closing schedules, then Tutor Perini could retain the holdbacks.[29] On the other hand, if Greenstar succeeded in collecting enough cash to hit the targets, then Tutor Perini was obliged immediately to release the holdbacks to the Sellers.[30]

---

[26] Merger Agreement §§ 1.01 (definitions of Indemnity Holdback Amount and Special Holdback Amount), 2.12, 6.08, 6.09; Tr. 628–29 (Burk).

[27] Merger Agreement §§ 1.01 (definition of "PCO Shortfall"), 6.08(c); Tr. 465–68 (Tutor).

[28] Tr. 102 (Segal); Tr. 419–20, 481, 394, 489–90 (Tutor); Tr. 628–29 (Burk).

[29] Holdback Agreement §§ 6.07, 6.08(a), 6.08(b); Tr. 390 (Tutor); Tr. 628–30 (Burk).

[30] Tr. 61–62 (Segal).

### C. The Parties Reach Impasse on The Release of The Holdbacks

In April 2013, Segal and Roman believed they had satisfied the conditions for the release of the holdbacks by converting enough of the CIE assets on Greenstar's closing statements into cash.[31] Tutor Perini disagreed for two principal reasons.[32] *First*, Tutor Perini questioned whether Greenstar's post-closing cash collections came from the receivables listed on the Merger Agreement's schedules, which were the assets Tutor Perini ultimately paid for.[33] *Second*, Tutor Perini was alarmed that Greenstar was confronting serious cash flow difficulties because its actual cash collections were lagging well behind its booked revenue.[34]

Ultimately, the dispute over holdbacks led the parties to negotiate the Holdback Agreement.[35] To avoid litigation, Ron Tutor proposed terms for a new agreement that would replace the Merger Agreement's provisions for the $17.5 million Indemnity Holdback and the $8 million Special Holdback.[36] In an April 5, 2013 letter, Ron Tutor outlined his proposal, stating that if the Sellers agreed

---

[31] JX 39 at 76437.

[32] JX 40 at 82349.

[33] *Id.*; Tr. 465–66 (Tutor) (explaining that "all [Tutor Perini] cares about is that we would come out whole on what they had booked and what we had approved.").

[34] Tr. 391–94 (Tutor); JX 134 at 00715.

[35] Tr. 397 (Tutor); JX 80 (the "Holdback Agreement").

[36] JX 40 at 82349–50.

8

to certain concessions, then Tutor Perini was "willing to accept more collection risk" and release the $17.5 million Indemnity Holdback.[37]  Among other things, the Holdback Agreement would require the Sellers to return some of the $17.5 million if "issues with collectability related to the funds released and/or held . . . result[ed] in a loss to [Tutor Perini's] current balance sheet position."[38]

## D. The Holdback Agreement

With the assistance of counsel, on May 3, 2013, Tutor Perini, Greenstar and IH Rep entered into the Holdback Agreement.[39]  The Sellers agreed to accept a $17.5 million promissory note in exchange for releasing their claims to the $17.5 million Indemnity Holdback under the Merger Agreement.[40]  As for the $8 million Special Holdback, the parties agreed to condition the release of that holdback on Greenstar's ability to convert specific CIE assets into cash.[41] To understand the mechanics of this aspect of the Holdback Agreement, it is useful briefly to examine some of the unique aspects of construction accounting that anchor the parties' agreement.

---

[37] *Id.*

[38] *Id.*; JX 24 at 82271.

[39] Holdback Agreement at 00137.

[40] *Id.* § 1.

[41] JX 24 at 82271; JX 40 at 82349–50.

## 1. Construction Accounting

When a contractor bids on a project, it bases its bid price on an estimate of future costs plus a profit margin.[42] If the contractor wins the bid, it must complete the work covered by the contract for the contract price—no matter the actual costs.[43] As a contractor builds the project, it incurs costs. As costs are incurred, the contractor and the owner often disagree over whether those costs relate to the original scope of work the contractor agreed to perform or work that extends beyond what the parties expected or intended. For instance, the owner may ask the contractor to do something different than what was in the original bid (a "change order")[44] or extra work to address a condition that surfaces on the job beyond the contractor's control and increases the contractor's costs (a "claim").[45] Generally

---

[42] Tr. 584 (Bennett).

[43] *See, e.g.*, JX 317 (accounting memo examining whether increased costs were within a project's original scope of work).

[44] Tr. 11–12 (Segal) (giving, as an example, a situation in which a contractor is building a courthouse, but the architect who drew up the plan for the courthouse forgot to include plans for renovating a courtroom. If the owner decides to add extra work (*e.g.*, renovation of the courtroom), then the extra work would be a change order.); Tr. 379:21–23 (Tutor) ("What it is, in fact, is, the owner issues a change order that states that he wants extra worked performed and asks to give a price."); Tr. 535 (Bennett).

[45] Tr. 13 (Soroka); Tr. 381 (Tutor); Tr. 535–36 (Bennett) (giving, as an example, a situation when another subcontractor slows down the contractor's work—causing the contractor to "spend extra money out of sequence or out of our control that we have to get reimbursed for."). In the case of a claim, the contractor must factor in both added costs and a margin for profit. Tr. 584–85 (Bennett). *See, e.g.*, JX 167 (describing a claim resulting from delays caused by Hurricane Sandy "[Five Star] submitted a Request for Equitable Adjustment ("REA") [(a type of claim)] on the Contract in the amount of $29.4M . . . Five Star has

Accepted Accounting Principles ("GAAP") allow a contractor to *book* (i.e., include as revenue) the costs associated with change orders and claims *if* the contractor believes it will eventually collect them from the owner.[46] Yet the contractor cannot *bill* for these costs (i.e., convert them into an account receivable) until the contractor and the owner agree that the owner is responsible for them.[47] Moreover, while the total amount of the claim asserted against the owner may include some profit margin, GAAP only allows a contractor to book revenue up to its actual costs.[48]

When a contractor recognizes unapproved or "pending" change orders or claims, and books them as revenue before they have been billed, the contractor incurs *costs in excess of billings* (or "CIE").[49] Like an account receivable, a contractor

---

incurred approximately $25.6M of additional . . . costs associated with these REAs. We have recognized $25.6M of these costs in revenue . . . which represents 100% of the costs incurred and 85% of the current REA amount.").

[46] Tr. 14 (Soroka); Tr. 536 (Bennett).

[47] Tr. 12–13, 14. (Segal); Tr. 381–82 (Tutor).

[48] Tr. 122 (Therien); Tr. 167 (Soroka).

[49] Tr. 15 (Soroka); Tr. 121–22 (Therien); Tr. 386 (Tutor) ("Most often, costs in excess, candidly, is another name for a claim outstanding that's unresolved."); Tr. 538 (Bennett). Another way to conceptualize CIE is to consider a "CR-1" analysis. A CR-1 analysis looks first at all the costs incurred on the project to date. Then, the profit margin is added on top of those costs by multiplying the current costs by the expected margin. If the sum of the current costs plus the profit margin is not greater than current billings, then the difference is called "costs in excess." Tr. 386:9 (Tutor).

records CIE on its balance sheet as an asset.[50]  But the value of the CIE asset does not necessarily equate to the full amount of the underlying change orders and claims.[51]  Instead, "[t]he philosophy is that [a contractor] would make an estimation of what [it] expects to recover in accordance with GAAP."[52]  In this regard, GAAP requires the contractor to reduce the value of CIE in anticipation that its collection may involve legal costs and disagreements with the owner (i.e., the "risk of collectability").[53]

### 2. Structure of the Holdback Agreement

With this background in mind, the Holdback Agreement provides two separate lists (appended to the agreement as Exhibits B and C), each containing change orders and claims from Greenstar's projects.[54]  Before Tutor Perini is obliged to release the $8 million Special Holdback, the Sellers are obliged to demonstrate that a specified portion of those change orders and claims will be converted into cash.[55]

---

[50] Tr. 122 (Therien); Tr. 306 (Soroka).

[51] Tr. 304 (Soroka).

[52] Tr. 305, 368 (Soroka).

[53] Tr. 368 (Soroka); Tr. 387 (Tutor).

[54] Tr. 176–77 (Soroka); Holdback Agreement at Ex. B, Ex. C.

[55] Tr. 176–77 (Soroka).

12

The Holdback Agreement's Exhibit B provides a list of "Pending Claims."[56] The total dollar value of the Pending Claims is $60.529 million (the "Cash Collection Required" or the "Bogey").[57] If Greenstar fails to collect the full amount of the Bogey, then any shortfall creates a "Pending Claims Uncollected Amount[]" (or "Shortfall").[58] If a Shortfall occurs, then Tutor Perini may "offset" that Shortfall against the $8 million Special Holdback.[59] "In other words, if the [Shortfall] is equal to or greater than $8 million, Tutor Perini owes Plaintiffs $0."[60] Specifically, Section 2 of the Holdback Agreement provides:

> Pending Claims. . . . [T]he pending claims set forth on Exhibit B hereto (the "Pending Claims") are the remaining outstanding claims that could have been made under . . . the Merger Agreement. [I]f the amounts set forth under the "Cash Collection Required" [(i.e., the Bogey)] with respect to the Pending Claims are not collected in full by [Greenstar] . . . prior to July 31, 2014 (or which [Tutor Perini] believes in good faith will not eventually be collected in full in accordance with [Greenstar's] customary business practices) (the "Pending Claims Uncollected Amounts"), [Tutor Perini] shall be entitled to offset such Pending Claim Uncollected Amounts solely against the [Holdback Amount (i.e., $8 million)].[61]

---

[56] Holdback Agreement § 2.

[57] *Id.* at Ex. B.

[58] *Id.* at § 2.

[59] *Id.*

[60] Def.'s Post-Trial Answering Br. ("DAB") (D.I. 194) at 13.

[61] Holdback Agreement § 2.

The Cash Collection Required are set forth on the following schedule:[62]

Exhibit B

**Greenstar**
**Pending Claims / Unbilled Costs**
**April 24, 2013**
**(000's)**

**Five Star:**

| Job | Claims/Unbilled @ 3/31/13 | Losses Previously Recorded | Cash Collection Required | Comment |
|---|---|---|---|---|
| 156 Stations | 1,000 | | 1,000 | Reserve for possible legal costs to finalize settlement and payment to PSE. |
| Freedom Tower | 5,800 | | 5,000 | Collection of $5M included in 2012 revenue for extended general condition claim of $29.4M (See Exhibit C) |
| 9/11 Memorial | 3,260 | | 3,268 | Collection of amount related to pending change orders as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| **DEP Jobs** | | | | |
| Bowery Bay | 1,863 | | 1,863 | Collection of amount related to pending change orders as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. Collection of $5.8M included in 2012 revenue for extended general condition claim of $23.1M (See Exhibit C) |
| Jamaica 2E | 5,800 | | 5,800 | |
| **Sub Total FSE** | 16,931 | - | 16,931 | |

**WDF:**

| Job | Claims/Unbilled @ 3/31/13 | Losses Previously Recorded | Cash Collection Required | Comment |
|---|---|---|---|---|
| Ward Island Interim (78H) | 2,478 | | 2,478 | Collection of amount related to delay claim as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Ward Island BNR (87G) | 558 | | 558 | Collection of amount related to pending change orders as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Jamaica 2G | 15,541 | (3,141) | 18,682 | Collection of amount related to request for compensatory delay as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| John Jay | 2,934 | | 2,934 | Collection of amount related to delay claim and pending change orders as of 3/31/13. Additional collection source from lawsuit and Subguard claim against subcontractor Vamco. Reduction in unbilled costs on a dollar for dollar basis as billed / settled and collected. |
| Newtown Creek 31G | 574 | | 574 | Collection of amount related to pending change orders as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Five Stations | 6,666 | (3,608) | 10,274 | Collection of amount related to request for compensatory delay as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Three Stations | 332 | (6,852) | 7,184 | Collection of amount related to request for compensatory delay as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Bronx Zoo | 324 | | 324 | Collection of amount related to delay claim and unpaid contract balance as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| Art Leather H5 | 568 | | 568 | Filed suit against Angoliades and its bonding company. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| 150 Amsterdam | 22 | | 22 | Collection of amount related to unpaid contract balance as of 3/31/13. Reduction in unbilled costs on a dollar for dollar basis as billed and collected. |
| **Sub Total WDF** | 29,997 | (13,601) | 43,598 | |
| **TOTAL** | 46,928 | (13,601) | 60,529 | |

---

[62] *Id.* at Ex. B.

14

In their effort to reach the Bogey, the Sellers are not limited to collection of the Pending Claims listed on Exhibit B. Rather, the Sellers can "credit[]" certain "Offset Claims" against the Shortfall.[63] The Offset Claims are those claims listed on Exhibit C that "result[] in additional net profit."[64] The Holdback Agreement describes the Offset Claims and their relationship to the Shortfall in a separate provision of Section 2:

> [A]ny "Offset Claims" that may be credited against the Pending Claims Uncollected Amounts shall only apply to the projects and claim amounts with respect to such projects set forth on Exhibit C hereto (and only to the extent that such "Offset Claim" results in additional net profit recognized by [Greenstar] after March 31, 2013 (or which [Tutor Perini] believes in good faith will result in additional net profit recognized in accordance with [Greenstar's] customary business practices[.])).[65]

While the Sellers can apply collections on Exhibit C claims to reach the Bogey, any counterclaim (i.e., a claim asserted against Greenstar on one of the Exhibit C projects) that remains outstanding when Tutor Perini calculates the Shortfall *increases* the Shortfall:

> [T]he amount of any Revised Offset Claims to be credited against the Pending Claims Uncollected Amounts shall be reduced to the extent that any counterclaim related to the projects set forth on Exhibit C (the "Counterclaims") remains outstanding on, has been alleged as of,

---

[63] *Id* at § 2.

[64] *Id.*

[65] *Id.*

15

or has otherwise been paid by [Greenstar] prior to, the date of the applicable calculation.[66]

In other words, counterclaims against Greenstar from projects listed on Exhibit C (below) decrease any credit from Exhibit C collections.[67]

*Remainder of Page Intentionally Left Blank*

---

[66] *Id.*

[67] *Id.* at Ex. C.

The Holdback Agreement also addresses how to assess the "prospective collectability" of claims.[68]

> The US GAAP position taken on [Tutor Perini's] financial statements regarding any Pending Claim or Offset Claim may be taken into

---

[68] *Id.* at § 2.

consideration, but shall not be dispositive, in assessing the prospective collectability of any such Pending Claim or Offset Claim.[69]

To summarize, for the Sellers to earn the $8 million Special Holdback, Greenstar must collect certain claims listed on Exhibits B and C in amounts sufficient to reach the Bogey (i.e., $60.529 million). For collections from Exhibit C to count, they must "result in additional net profit . . . after March 31, 2013."[70] And any counterclaims against Greenstar on projects listed on Exhibit C effectively increase the Bogey. In making any of these calculations, Tutor Perini's GAAP position "in assessing the prospective collectability of any such Pending Claim or Offset Claim may be taken into consideration, but shall not be dispositive."[71] Section 4 of the Holdback Agreement allows Tutor Perini to "offset" the total Shortfall (after adjustments for Exhibit C Offset Claims and counterclaims) against the $8 million Special Holdback.[72] But, to the extent the total Shortfall is less than the Special Holdback, Tutor Perini must release the difference to the Sellers.[73]

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at § 4.

[73] *Id.*

18

On Exhibit D (below), titled "Example of Escrow Holdback Calculation," the parties agreed to two examples that illustrate how the Holdback Agreement is intended to work:[74]

*Remainder of Page Intentionally Left Blank*

---

[74] *Id.* at Ex. D.

Example of Escrow Holdback Calculation
(000's)

| Example I | | Amount | Disbursement to Int. Holder Rep |
|---|---|---|---|
| Total cash collection requirement per Exhibit B: (Can be made up of any combination of cash reciepts from Exhibits B & C) | | $ 60,529 | |
| Cash collected through period xx/xx/xxxx | | | |
| • Pending claims / unbilled cost receipts from Exhibit B | 45,529 | | |
| • Offset claim reciepts from Exhibit C | 5,000 | 50,529 | |
| Net balance to collect | | $ 10,000 | |
| Total Offset Amount Requirement: | | | |
| • Adjusted special holdback amount per Section 3 (a) | | $ 8,000 | |
| • Earn out offset per section 3 (b) (Maximum requirement going forward; Parent to release any prior offset amount in Excess of $2,000) | | 2,000 | * TBD (Based on withheld amount) |
| Total offset amount | | $ 10,000 | |
| Amount Due to Interest Holder Rep ($8,000 - $8,000) | | | $ - |

| Example II | | Amount | Disbursement to Int. Holder Rep |
|---|---|---|---|
| Total cash collection requirement per Exhibit B: (Can be made up of any combination of cash reciepts from Exhibits B & C) | | $ 60,529 | |
| Cash collected through period xx/xx/xxxx | | | |
| • Pending claims / unbilled cost receipts from Exhibit B | 50,529 | | |
| • Offset claim reciepts from Exhibit C | 5,000 | 55,529 | |
| Net balance to collect | | $ 5,000 | |
| Total Offset Amount Requirement | | | |
| • Adjusted special holdback amount per Section 3 (a) | | 5,000 | |
| • Earn out offset per Section 3 (b) (No further offset requirement; Parent to release any prior offset amount.) | | - | * TBD (Based on withheld amount) |
| Total Offset Requirement | | $ 5,000 | |
| Amount Due to Interest Holder Rep ($8,000 - $5,000) | | | $ 3,000 |

20

As depicted in Exhibit D, the Sellers are able to rely on "any combination of cash receipts from Exhibits B & C" to reach the Bogey.[75] Example I assumes that Greenstar collects (i) $45,529,000 on "Pending claims / unbilled costs receipts from Exhibit B," and (ii) $5,000,000 on "Offset claim receipts from Exhibit C."[76] The total collection, therefore, is $50,529,000. At this number, the Sellers would be $10,000,000 short of the Bogey and Tutor Perini could withhold the entire $8,000,000 Special Holdback.[77] Example II is similar, but the Sellers are only $5,000,000 short. In this circumstance, Tutor Perini would keep $5,000,000 of the Special Holdback and pay the Sellers $3,000,000.[78]

### E. The Parties Reach an Impasse on Release of the Special Holdback Under the Holdback Agreement

By the fall of 2014, the Sellers believed they had reached the Bogey and demanded that Tutor Perini release the $8 million Special Holdback.[79] Again, Tutor Perini disagreed.[80] One of the first points of contention was the source of

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] JX 136 at 00722.

[80] JX 192 at 009–11.

Greenstar's cash collections.[81] From Tutor Perini's perspective, it was unclear whether the Sellers' Bogey calculation used the specific claims on Exhibits B and C or unrelated cash flows.[82] The parties also disagreed over the collection standard for Exhibit C claims. Specifically, they disputed what it meant for an Exhibit C claim to generate additional "net profit."[83] Finally, the parties could not agree on what counterclaims remained outstanding as possible offsets on Exhibit C projects.[84]

In a series of letters from April 17 through May 5, 2015, the breadth and intensity of the parties' disagreements were fully exposed.[85] On May 8, however, negotiations took a promising turn when Ron Tutor stated that he "believ[ed] equity support[ed] the payment of $6M out of [the] $8M escrow account on the [belief] that many of the claims, although uncollected, will be collected."[86] Unfortunately, the promise of a negotiated resolution was fleeting. Ron Tutor apparently had a change of heart and Tutor Perini returned to its position that Greenstar's cash collections did

---

[81] *Id.* at 0010.

[82] *Id.*; JX 173.

[83] JX 192 at 0010.

[84] *Id.* at 0010–11.

[85] JX 199; JX 214.

[86] JX 227; PTO § III.B.11.

22

not support payment of any of the Special Holdback.[87]  Later in 2015, Tutor Perini

fired Segal as CEO of Five Star.[88]  This litigation followed.

## F.  Procedural Posture

On November 7, 2016, Plaintiffs, Greenstar IH Rep and Segal, filed the

Verified Complaint.[89]  The Complaint alleged (1) breach of contract concerning

Tutor Perini's failure to make earn-out payments under the Merger Agreement

(Counts I, II and III);[90] (2) breach of contract and promissory estoppel concerning

Tutor Perini's failure to release the $8 million Special Holdback as required under

the Holdback Agreement and as promised by Ron Tutor (Counts IV and V);[91] and

(3) declaratory relief seeking to enjoin a previously-initiated California arbitration

by Tutor Perini against Segal in favor of the forum selection provision in the parties'

Merger Agreement (Counts VI, VII and VIII).[92]

On December 22, 2016, Plaintiffs moved for judgment on the pleadings on

Counts VI, VII and VIII and asked the Court to require Tutor Perini to withdraw its

---

[87] Tutor Dep. 146:8–150:7 (D.I. 165).

[88] Tr. 445 (Tutor).

[89] Verified Compl. ("Compl.") (D.I. 1).

[90] *Id.* ¶¶ 65–82.

[91] *Id.* ¶¶ 83–92.

[92] *Id.* ¶¶ 105–10.

California arbitration in favor of litigation in Delaware.[93]  By Memorandum Opinion dated February 23, 2017, this Court held that whether the claims asserted by Tutor Perini against Segal in the arbitration were arbitrable was a question that must be answered by the arbitrator (Count VI).[94]  Plaintiffs' declaratory relief claims (Counts VII and VIII) were dismissed by Order dated June 5, 2017.[95]

On March 9, 2017, Tutor Perini filed an Answer to the Complaint and asserted counterclaims for fraud and offset against Segal.[96]  By Memorandum Opinion dated October 31, 2017, this Court held that IH Rep was entitled to certain earn-out payments under the Merger Agreement and dismissed Tutor Perini's fraud and offset counterclaims.[97]  On November 30, 2017, Tutor Perini filed a Notice of Appeal of

---

[93] D.I. 14.

[94] D.I. 20.

[95] D.I. 31.  Count VII sought a declaratory judgment that indemnification claims against Segal pending in the California arbitration were not arbitrable.  Compl. ¶¶ 99–104. Count VIII sought a declaratory judgment that Tutor Perini's claims for consequential damages arising out of post-closing governmental investigations were governed solely by the Merger Agreement and, thus, were not arbitrable.  Compl. ¶¶ 105–10.

[96] D.I. 22.

[97] D.I. 38.

this Court's Final Order and Judgment.[98] The Supreme Court affirmed by Order dated May 11, 2018.[99]

This left only Plaintiffs' claims for breach of contract and promissory estoppel related to release of the $8 million Special Holdback (i.e., Counts IV and V).[100] The Court held a three-day trial on these claims on April 18, 2019.[101] After trial, Plaintiffs filed a motion to strike one of Tutor Perini's trial demonstratives and related trial testimony.[102] Following post-trial briefing, the parties submitted this matter for decision after post-trial oral argument on September 10, 2019.[103]

## II. ANALYSIS

The Sellers allege Tutor Perini breached the Holdback Agreement by refusing to release the $8 million Special Holdback to IH Rep.[104] Specifically, they say Greenstar has collected more than $60.529 million on the pending change orders and claims listed on Exhibits B and C, thus mandating release of the Special Holdback

---

[98] D.I. 45 (the Court entered a partial final judgment under Court of Chancery Rule 54(b)).

[99] D.I. 76.

[100] Compl. ¶¶ 83–92.

[101] D.I. 182.

[102] D.I. 188.

[103] D.I. 222.

[104] Compl. ¶¶ 83–87.

25

under Sections 2 and 4 of the Holdback Agreement. The Sellers alternatively contend they are entitled to at least $6 million of the Special Holdback under a promissory estoppel theory.[105] For this claim, the Sellers point to Ron Tutor's May 8, 2015 email, stating that he "believ[ed] equity support[ed] the payment of $6M out of [the] $8M escrow account," as the promise upon which they detrimentally relied.[106]

Tutor Perini counters that Greenstar has not collected enough cash to trigger release of the Special Holdback. Generally, Tutor Perini argues the Sellers' alleged collections do not meet the requirements set out in Section 2 of the Holdback Agreement. In response to the Sellers' promissory estoppel claim, Tutor Perini contends, among other things, that Ron Tutor's May 8 email did not constitute a promise.[107]

I begin and end my analysis with the Sellers' breach of contract claim. To prevail on a breach of contract claim, a plaintiff must prove by a preponderance

---

[105] PTO § I.

[106] JX 227; *see* PTO § III.B.11.

[107] PTO § IV.B.5.

of the evidence (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages suffered because of the breach.[108]

Tutor Perini stipulates that the Holdback Agreement is a binding contract.[109] It also concedes it has not paid the $8 million Special Holdback.[110] Accordingly, to succeed, the Sellers must prove—by a preponderance of the evidence—that Tutor Perini breached an obligation to pay the Sellers at least a portion of the Special Holdback. For reasons explained below, I conclude the Sellers have carried that burden under the clear and unambiguous terms of the Holdback Agreement.

## A. Construction of the Holdback Agreement

"The primary goal of contract interpretation is to 'attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted.'"[111] In the search for the parties' shared expectations, the court's first and often last stop is the contract itself.[112] "If, on its face, the 'contract is

---

[108] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (citing *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006)).

[109] PTO § III.B.5.

[110] *Id.* at § III.B.10.

[111] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 14 (Del. Ch. 2003).

[112] *S'holder Representative Servs. LLC v. Gilead Scis., Ind.*, 2017 WL 1015621, at *16 (Del. Ch. Mar. 15, 2017), *aff'd*, 177 A.3d 610 (Del. 2017) ("[a] contract's express terms provide the starting point in approaching a contract dispute.") (internal quotations omitted); *GMG Capital Invs., LLC v. Athenian Venture P'rs*, 36 A.3d 776, 779–80 (Del. 2012)

unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity.'"[113]

As is often the case in contract disputes, the parties agree the Holdback Agreement is unambiguous. And yet, as is almost always the case in contract disputes, the parties disagree over what the Holdback Agreement means. Of course, the parties' disagreement over an agreement's proper construction, alone, does not render it ambiguous.[114] Rather, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[115] On the other hand, a contract is *unambiguous* when the agreement's "ordinary meaning leaves no room for uncertainty,"[116] and "the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation."[117]

---

("[T]he Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

[113] *S'holder Representative Servs.*, 2017 WL 1015621, at *16 (quoting *GMG Capital*, 36 A.3d at 783).

[114] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[115] *Id.*; *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("Although the parties disagree as to the proper interpretation of the contract, their disagreement does not create an ambiguity.").

[116] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[117] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

The question, then, is whether the Holdback Agreement has only one reasonable interpretation "when read in full and situated in the commercial context between the parties."[118] In this regard, when assessing "commercial context," the court may consider the parties' "view of the overall transaction" and associated "description[s] of the transaction" without running afoul of the parol evidence rule.[119]

I begin the contract construction exercise by noting where the parties agree. *First*, the parties agree on the basic approach for determining whether the Special Holdback has been earned: the Sellers get credit for collections on Exhibit B claims plus collections on Exhibit C claims minus counterclaims listed on Exhibit C that are outstanding as of the calculation date.[120] *Second*, they agree on the standard for Exhibit B collections. Specifically, to count as collectable, Greenstar must realize either an actual cash collection or "a legal entitlement to collect amounts, which standard is satisfied only through an executed change order or a legally enforceable

---

[118] *Chicago Bridge & Iron Co. NV v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017) (citing *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)).

[119] *See Chicago Bridge*, 116 A.3d. at 915, 927 (finding that a contract was "unambiguous when read in full and situated in the commercial context between the parties" and considering the parties' "description of the transaction").

[120] Pls.' Post-Trial Reply Br. ("PRB") (D.I. 202) at 3.

settlement or judgment."[121]  *Third*, the parties agree that only collections specifically related to the claims listed on Exhibits B and C should count toward the Bogey; revenue unrelated to the claims and change orders on the agreement's exhibits will not count.[122]

The parties' principal dispute is over which of the Exhibit C collections to count toward the Bogey.  The disagreement concerns language in Section 2, where the parties agreed, "'Offset Claims' . . . *may be credited against* [*the Shortfall*] . . . with respect to such projects set forth on Exhibit C . . . *to the extent that such 'Offset Claim' results in additional net profit.*"[123]  The parties agree Exhibit C Offset Claims only count to the extent they "result[] in additional net profit."[124]  But they do not agree on what the phrase "additional net profit" means in the context of this provision.

The Sellers argue any collection from Exhibit C should count toward the Bogey except in rare situations when a collection from an Exhibit B claim overlapped with an Exhibit C collection.[125]  This interpretation—like the general

[121] DAB at 11 n.3 (citing Pls.' Pre-Trial Br. ("PPTB") (D.I. 173) at 51).

[122] Tr. 75:3–7 (Segal).

[123] Holdback Agreement § 2 (emphasis supplied).

[124] *Id.*; DAB at 13–14; Pls.' Opening Post-Trial Br. ("POB") (D.I. 191) at 37.

[125] POB at 37.

structure of the Holdback Agreement—focuses on cash collections.[126]  In this regard, the Sellers emphasize that the collection standard for Exhibits B and C is the same (i.e., cash in the door or a legal entitlement to cash).[127]

The Sellers' construction lines up well with the calculation examples provided on Exhibit D.  Indeed, that exhibit directly supports the premise that any Exhibit B and C cash collections should be added together when determining whether the Bogey has been hit: "Total cash collection requirement per Exhibit B (*can be made up of any combination of cash receipts from Exhibits B and C*)."[128]

---

[126] Specifically, the Sellers make the point that any attempt to place outsized emphasis on the words "net profit" as used in Section 2 would be inappropriate given that the agreement, as a whole, places much more emphasis on cash collections.  Holdback Agreement § 2, Ex. D.  *GMG Capital*, 36 A.3d at 779 ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.").

[127] PPTB at 51.

[128] Holdback Agreement at Ex. D (emphasis supplied).  Tutor Perini argues the Sellers place too much weight on Exhibit D.  *See* DAB at 17 ("Exhibit D simply presents two examples of how the calculation of the [Bogey] can be reached.").  This argument misses the mark because it ignores the express terms of the contract.  The Holdback Agreement makes clear that Exhibit D is just as much a part of the agreement as Exhibits B and C. *See* Holdback Agreement § 9(e) ("This agreement *and the other documents referred to herein and therein* embody the complete agreement[.]") (emphasis supplied).  Exhibit D contains clarifying language—together with its examples—that must be read along with Section 2.  "Contract[s] must [] be read as a whole, giving meaning to each term." *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). Thus, the general, undefined term "net profit" must be construed in light of the specific clarification provided in Exhibit D.  *Id.* (holding that "general terms of the contract must yield to more specific terms.").

The comments on Exhibits B and C (below) also support the Sellers' position that collections on Exhibit B and C claims, added together, will be credited against the Bogey without condition.[129]

| Job | Exhibit B<br><br>Claims / Unbilled @ 3/31/13 | Exhibit C<br><br>Claim Amount | Exhibit B Comment | Exhibit C Comment |
|---|---|---|---|---|
| Freedom Tower[130] | $5 | $29.436 | Collection of $5M *included in 2012 revenue* for [] general condition claim of $29.4M (See Exhibit C). | *Claim amount settled less $5M previously recognized will be offset amount* (see Exhibit B). |
| Jamaica 2E[131] | $5.8 | $23.086 | Collection of $5M *included in 2012 revenue* for [] general condition claim of $23.1M (See Exhibit C). | *Claim amount settled less $5M previously recognized will be offset amount* (see Exhibit B). |
| Jamaica 2G | $15.541 | $7.3 | Collection of amount related to request for [] delay as of 3/31/13. | |

---

[129] Post-Trial Oral Arg. (D.I. 224) at 15–16; Holdback Agreement at Ex. B, Ex. C (emphasis supplied).

[130] JX 16 at 0082827–28 (accounting memo showing that Five Star had submitted a $29.4 million claim of which $5 million was booked as of March 31, 2013).

[131] JX 170 at 0187440–41 (accounting memo showing that Five Star had submitted a $23.3 million claim of which $5.8 million was booked).

The Sellers contend that these three claims on Exhibit C included amounts that had already been booked when the Holdback Agreement was executed.[132] They say the Exhibit B amount was the portion of the claim that Greenstar had booked, and the Exhibit C amount was the *total* amount Greenstar could identify—but which may not have been booked as CIE.[133] They note that Exhibit C's two comments explicitly state that the "Claim amount settled [(i.e., collected)] less [the amount] previously recognized *will be [the] offset amount*."[134] In other words, the Sellers may credit all Exhibit B and C collections—allocated first to Exhibit B with any overflow going to Exhibit C in the event of overlap.

According to the Sellers, the purpose of the "net profit" requirement for Exhibit C is to avoid double counting.[135] The net profit requirement thus recognizes and accounts for the fact that Exhibit C claims sometimes *include* claims on

---

[132] PRB at 4–5. Tutor Perini disputes whether these three projects were the only Exhibit C claims with booked amounts as of the Holdback Agreement's execution. *See* DAB at 14–15. Ultimately, I need not reach the question of exactly which Exhibit C claims were booked or unbooked because the main purpose of the net profit requirement is to avoid double counting the same cash collections on both Exhibits B and C.

[133] The Sellers credibly explain that the parties broke the claims into two exhibits for accounting reasons. Exhibit B claims were booked as revenue when the Holdback Agreement was executed while Exhibit C claims were, for the most part, not. *See* PRB at 4; Tr. 465–66 (Tutor); Tr. 20–21, 25 (Segal); Tr. 673 (Burk). Tutor Perini's counter-argument that the Sellers have "strip[ped] out the distinction between the two [exhibits]" is factually unpersuasive. *See* Post-Trial Oral Arg. (D.I. 244) at 96.

[134] Holdback Agreement at Ex. C.

[135] PPTB at 42–43.

Exhibit B.[136]  In such cases, if Greenstar collects the full amount of the Exhibit C

claim, only that portion which "results in additional net profit . . . *after* the [Holdback

Agreement's execution]" (i.e., the unbooked portion) will count as an Exhibit C

Offset Claim.[137]  The remainder is credited under Exhibit B.  Thus, according to the

comments in the exhibits, when there is overlap between Exhibits B and C, the

Exhibit C "claim amount settled less [] previously recognized will be [the] offset

amount."[138]

---

[136] *See, e.g.*, Holdback Agreement at Ex. C.  Tutor Perini argues that the Sellers' interpretation "contradicts the entire purpose and structure of the Agreement [because] if any collections on Exhibits B and C projects counted to reduce the [Bogey] . . . there would have been no reason to separately break out certain claims and projects on Exhibits B and C and to impose a distinct 'additional net profit' requirement . . . ."  DAB at 16–17.  Tutor Perini's argument fails to recognize the commercial context of the Holdback Agreement. *See Chicago Bridge*, 166 A.3d at 926–27.  The Holdback Agreement clearly states that the "pending claims . . . set forth on Exhibit B . . . are the remaining outstanding claims that could have been made under . . . the Merger Agreement."  Holdback Agreement § 2.  Thus, the two different schedules divide claims still outstanding from the 2011 Merger Agreement (*i.e.*, Exhibit B) from the total outstanding claims on the projects (*i.e.*, Exhibit C)—which sometimes included the claims listed on Exhibit B.  The net profit requirement avoided double counting.  Tutor Perini acknowledges as much in its briefs. *See* DAB at 5–6 ("The first schedule, Exhibit B, reflected $60.529 million of specific claims, unbilled costs, and previously recorded losses that still had not been resolved as of April 24, 2013. . . .  The second schedule, Exhibit C, reflected the total claims for the listed projects as of April 24, 2013.") (citations omitted).  While at times overlapping, the two Exhibits clearly served separate functions. *See iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257 at *5 (Del. Ch. July 29, 2016) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").

[137] Holdback Agreement § 2, Ex. B, Ex. C.  This dynamic comes to light when examining the comments on Exhibits B and C.

[138] *Id.* at Ex. C.

The Sellers' proffered interpretation aligns with the ordinary meaning of "net profit."[139] Here again, it is important to focus on the commercial context of the contract.[140] The Holdback Agreement itself requires "the Pending Claims [to be] *collected* in full."[141] There is no mention of Greenstar's broader operational profitability. The genesis of the cash collection requirement is what Ron Tutor described as Tutor Perini's "collection risk" and the concomitant need for the acquired businesses to collect what Tutor Perini "paid for."[142] This collection risk is a key component of the Holdback Agreement's commercial context.

All things equal, the collection of unbooked claims increases net profit because collections increase revenue without increasing costs.[143] Moreover, even if

---

[139] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (stating that courts are "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended.") (internal quotations omitted). A common definition of net profit is, "the money made by a company or part of a company for a particular period after all costs, taxes, etc. have been paid." *Net Profit*, CAMBRIDGE DICTIONARY (last visited Oct. 4, 2019), https://dictionary.cambridge.org/us/dictionary/english/net-profit.

[140] *Chicago Bridge*, 166 A.3d at 926–27.

[141] Holdback Agreement § 2 (emphasis supplied).

[142] JX 40; JX 227; Tr. 465–66 (Tutor).

[143] Tr. 587–88, 602 (Bennett); Tr. 312–13 (Soroka) ("Q. If you decrease revenue, and all other things are equal, you're going to decrease profit. Correct? A. That is correct. Q. And if you increase revenue, all other things being equal, you're going to increase profit. Correct? A. That is correct. Q. . . . [I]f you've already done the work, you have a pending change order, you know, the owner says, 'Yeah, that was in the original scope of work. I'm not paying for that.' And you agree with the owner and you say, 'Okay, I'm writing that off.' That's going to reduce revenue. Correct? A. That would reduce revenue,

a claim amount were booked (and thereby already increased revenue and profitability), failure to *collect* a booked amount would cause a write-down and corresponding reduction in profitability.[144] As a result, the only way the collection of an Exhibit C claim would *not* increase profitability is if it had already been accounted for on Exhibit B—a nuance the Sellers capture specifically in their proposed construction by prohibiting double counting.[145]

After carefully considering the Sellers' proffered construction of the disputed provisions of the Holdback Agreement, I am satisfied it is reasonable and well supported by the express terms of the contract and its incorporated examples, particularly "when read in full and situated in the commercial context between the parties."[146] To answer the ambiguity question, however, I must determine whether the Sellers' construction is the *only* reasonable construction or whether Tutor Perini has proffered a reasonable construction as well.

For its part, Tutor Perini reads the net profit requirement to mean that collections on Exhibit C claims only count toward the Bogey if the *projects*

---

yes. Q. And the expected change in revenue in my example would decrease profitability. Correct? A. That is correct.").

[144] Tr. 312–13 (Soroka).

[145] Tr. 29–30 (Segal).

[146] *Chicago Bridge*, 166 A.3d at 926–27.

*themselves* generate net profit.[147]  Specifically, according to Tutor Perini, "[w]hether an Exhibit C Offset Claim has generated 'additional net profit' is determined by calculating the P&L impact that the resolution of the claim has on the *project*."[148] Under this construction of Section 2, there is no single formula for determining net profit.  Rather, "[t]he specific method by which this calculation is performed depends on various factors unique to each job."[149]  To account for the fact that its net profit definition cannot be applied consistently across all projects, Tutor Perini claims the Holdback Agreement grants it significant discretion as the "arbiter of net profits" to decide when a job has yielded "additional net profit" such that collections on Exhibit C claims may be counted toward the Bogey.[150]

Even a cursory glance reveals that Tutor Perini's proffered construction adds limitations to Exhibit C collections that appear nowhere in the Holdback Agreement.[151]  The parties took pains to set out the mechanics for calculating the

---

[147] Holdback Agreement § 2; DAB at 13.

[148] DAB at 21 (emphasis supplied).

[149] *Id.*

[150] *Id.* at 21 n.8.

[151] The Holdback Agreement has an integration clause.  Holdback Agreement § 9(e) ("This Agreement and the other documents referred to herein and therein embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.").  Delaware law disfavors adding limitations to a contract not found in its language.  *Emmons v. Hartford*

37

Shortfall but, tellingly, Tutor Perini's net profit formulation is missing.[152] The omission of Tutor Perini's case-by-case approach from the Holdback Agreement is stark and likely reveals the parties' appreciation that any such approach would drag out the determination of the Special Holdback indefinitely as the parties await completion of long-term construction projects to assess net profitability. As discussed below, this strung out process not only would conflict with the contract's overall scheme for incentivizing collections, it would render the specific examples the parties agreed to in Exhibit D (that contemplate a more predictable approach to determining net profit) meaningless.

*First*, the Holdback Agreement describes the accounting standards that would govern the "*prospective collectability* of any [] Pending Claim or Offset Claim."[153] In this regard, Tutor Perini's "US GAAP position taken on [Tutor Perini's] financial statements . . . may be taken into consideration" but it is not "dispositive."[154] This language makes clear that (1) collectability is the focus, and (2) Tutor Perini's

---

*Underwriters Ins. Co.*, 697 A.2d 742, 746 (Del. 1997) ("[A] [c]ontract interpretation that adds a limitation not found in the plain language of the contract is untenable.").

[152] In short, the Holdback Agreement does not "confer[] discretion on one party." *See, e.g.*, *Miller v. HCP & Co.*, 2018 WL 656378, at *10 (Del. Ch. Feb. 1, 2018) (analyzing an agreement that gave a party the right to "determine in its sole discretion the manner in which [a sale] shall occur").

[153] Holdback Agreement § 2 (emphasis supplied).

[154] *Id.*

38

determinations of net profit per job are not controlling. The parties gave no indication in the Holdback Agreement that Tutor Perini had been granted unchecked discretion as an "arbiter" of net profit.[155] And there is no basis to inject that authority into the agreement after the fact.

*Second*, Exhibit D provides two calculation examples—neither of which even mention the word "profit" or "profitability." To the contrary, Exhibit D states the "[t]otal cash collection requirement . . . can be made up of any combination of *cash receipts* from Exhibits B & C," and "*cash collected*" should be added to "offset claim receipts."[156] Again, the focus is on cash collections. Nothing in these examples suggests that collections are subject to Tutor Perini's discretionary determination of whether the collections increased net profit on a job-by-job basis.[157]

---

[155] DAB at 21 n.8.

[156] Holdback Agreement at Ex. D (emphasis supplied).

[157] *Id.* Tutor Perini argues, "[i]t is naïve and detached from reality to suggest that net profits on the Exhibit C Offset Claims can be determined by looking only at two static numbers on Exhibits B and C without accounting for any subsequent events and other variables on the project." DAB at 15–16. According to Tutor Perini, the variables that might impact the profitability on a project are "infinite" and must be accounted for in the net profit determination. Tr. 168 (Soroka) (stating that infinite variables could impact profitability). What the Holdback Agreement actually says, however, is that "[t]otal cash collections . . . [c]an be made up of any combination of cash receipts from Exhibits B & C." Holdback Agreement at Ex. D. To reiterate, Delaware courts will not "add[] a limitation not found in the contract language." *Nw. Nat'l Ins.*, 672 A.2d at 44. Yet Tutor Perini would have the Court add, as a limitation on Exhibit C collections, an unspoken condition that they satisfy a project-by-project net profitability test of Tutor Perini's own design. This interpretation "adds a limitation" to "the common and ordinary meaning of the word '[net profit]' as used in the [Holdback] Agreement" that does not square with the contract's express terms. *Id.*

39

*Third,* Tutor Perini's construction ignores the commercial context in which the parties agreed to modify the prerequisites to earning the Special Holdback.[158] Ron Tutor, himself, explained that the Holdback Agreement was meant to address Tutor Perini's "collection risk"[159] and to "motivate [Segal] to collect our [] cash."[160] Stated simply, Tutor Perini wanted to realize Greenstar's balance sheet net worth in full by collecting amounts Greenstar claimed it was owed.[161] Tutor Perini's litigation construct of needing to realize net profit on as yet completed jobs as a predicate to paying the Special Holdback not only finds no support in the contract, it does not comport with the commercial context the parties were addressing when they entered into the Holdback Agreement. In other words, Tutor Perini's proffered construction is not reasonable.

******

Having concluded the Sellers have offered the only reasonable construction of the Holdback Agreement, I am satisfied the contract is not ambiguous and that the Sellers' construction must prevail. Cash collections associated with claims listed

---

[158] *Chicago Bridge*, 166 A.3d at 926–27.

[159] JX 40 at 82349.

[160] Tr. 490 (Tutor).

[161] Tr. 468 (Tutor).

on Exhibit C meet the Exhibit C collection standard as long as such receipts are not double-counted with actual receipts from Exhibit B.

## B. Tutor Perini Must Release All of the $8 Million Special Holdback

Deciding the proper construction of "net profit" does not end the parties' dispute. Even when applying the Sellers' construction of net profit, Tutor Perini argues the Sellers still have not proven their entitlement to the $8 million Special Holdback. Resolving this dispute requires a careful review of Greenstar's projects, as listed on Exhibits B and C, to determine whether the Sellers have proven, by a preponderance of the evidence, that Greenstar collected at least $52.529 million (net of outstanding counterclaims) in order for the Sellers to recover at least some of the Special Holdback.[162]

---

[162] Holdback Agreement at Ex. D; PRB at 28. *See* DAB at 6 (citing JX 82 § 2), 24–25 ("The parties agreed in the Holdback Agreement that any counterclaims that are pending, have been alleged, or have otherwise been paid reduce the offset credit to which Plaintiffs are entitled.") (citing Segal Dep. 103:18–104:4 (D.I. 165); Vaiana Dep. 188:14–189:15 (D.I. 165)).

The parties dispute approximately $34 million of collections across four named projects: 156 Stations ($10.5 million),[163] Freedom Tower ($5 million),[164] Jamaica 2G ($16.582 million)[165] and John Jay ($1.538 million).[166] The parties also dispute the total amount of counterclaims pending against Greenstar on Exhibit C claims. For reasons stated in detail below, the preponderance of the evidence proves that Sellers are entitled to all of the $8 million Special Holdback.

---

[163] DAB at 26 ("Exhibit C listed $11.884 million under 156 Stations, which represented the amount of a judgment secured by Five Star on the 156 Stations project. It is undisputed that this judgment was subsequently settled on March 30, 2015 for $10.5 million."). The dispute is whether the full amount of the $11.884 judgment on Exhibit C had been booked as of 3/31/13. Tutor Perini argues that it was. *Id.* (citing Tr. 546:12–550:21 (Bennett); JX 48; JX 411). Accordingly, it argues that collection of this amount from Exhibit C did not increase "net profit" and, therefore, should not be credited toward the Bogey. *Id.* at 27.

[164] Both parties agree that the Sellers are entitled to credit at least $12 million in collections on this project. *See id.* at 27. The dispute is over $5 million in "pre-[hurricane] Sandy claims" related to the total claim of $29.4 million on Exhibit B. Holdback Agreement at Ex. B; *id.* at 28; PRB at 21.

[165] DAB at 38–42.

[166] *Id.* at 42–43. There are other disputed collections, counterclaims and contract construction issues. *See*, *e.g.*, PRB at 21, 28–29 ((i) Amtrak ($1.651 million disputed), (ii) Newtown Creek counterclaim ($9.173 million disputed), (iii) whether the Sellers are entitled to credit "prospective collections" from Exhibit C). I need not resolve these disputes, however, given my finding that the Sellers have hit the Bogey with collections on other claims associated with other projects.

42

## 1. $45 Million of Undisputed Collections

Before addressing the disputed collections, I recount the collections upon which the parties agree. Tutor Perini gives the Sellers credit for the following receipts (assuming the Sellers' construction of "net profit" is correct):[167]

| Project | Undisputed Credit[168] |
|---------|------------------------|
| Freedom Tower | $12 million[169] |
| 9/11 Memorial | $15.068 million[170] |
| Bowery Bay | $1.215 million[171] |
| Scada 24 | $1.25 million[172] |
| Scada 27 | $1.5 million[173] |

[167] *See* PRB at Ex. 1.

[168] This column includes amounts collected that Tutor Perini does not dispute the Sellers may credit assuming the Sellers' proposed construction of "net profit" is correct.

[169] DAB at 27 ("Exhibit B required Five Star to collect $5 million, which was the recorded amount on the $29.4 million claim reflected on Exhibit C for the Freedom Tower project. The $29.4 million claim was settled for $12 million in Q1 2016.") (citations omitted). I address disputed amounts with respect to Freedom Tower below.

[170] *Id.* at 29 ("There is no dispute that the $3.268 million on Exhibit B for the 9/11 Memorial project was collected. It is also undisputed that the $18.005 million claim on Exhibit C was settled in Q1 2015 for $11.8 million.") (citations omitted).

[171] *Id.* at 30 ("The comment associated with Bowery Bay provides that the $1.863 million on Exhibit B represents 'amounts relating to pending change orders.' Five Star collected $1.799 million in connection with the final close-out of the project, but it is undisputed that only $1.215 million was attributable to pending change orders.") (citation omitted).

[172] *Id.* at 31 ("A claim for $5.764 million appears on Exhibit C. It is undisputed that Five Star collected $1.4 million in connection with the final close-out of the project . . . and that only $1.25 million of that amount was attributable to the claim.") (citation omitted).

[173] *Id.* at 31–32 ("A claim for $5.229 million appears on Exhibit C. It is undisputed that Five Star collected $1.98 million in connection with the final settlement of this project . . . and that only $1.5 million of that amount was attributable to the claim.") (citations omitted).

| | |
|---|---|
| Heschel | $.388 million[174] |
| Community Health | $.107 million[175] |
| Eagle | $.111 million[176] |
| Metro Campus | $.057 million[177] |
| PS 95X | $.155 million[178] |
| Young Womans | $.020 million[179] |
| Ward Island Interim (78H) | $2.99 million[180] |
| Ward Island BNR (87G) | $.241 million[181] |
| John Jay | $1.562 million[182] |

[174] *Id.* at 33 ("A claim for $1.411 million appears on Exhibit C. The parties agree that $388,070.14 was collected on the claim in Q2 2015 in connection with the settlement of the project.") (citations omitted).

[175] *Id.* at 34 ("A claim for $129,000 appears on Exhibit C. The parties agree that the claim was settled for $107,030 in Q3 2018.") (citations omitted).

[176] *Id.* at 34 ("A claim for $212,000 appears on Exhibit C. The claim was settled for $111,184 in Q3 2014.") (citation omitted).

[177] *Id.* at 35 ("A claim for $794,000 appears on Exhibit C. The parties agree that the claim was settled in Q2 2016 for $57,753.") (citation omitted).

[178] *Id.* at 35 ("A claim for $526,000 appears on Exhibit C. The parties agree that the claim was settled in Q1 2018 for $155,000.") (citation omitted).

[179] *Id.* at 36 ("A claim for $20,000 appears on Exhibit C. The parties agree that the claim was settled for $20,000 (full value) in Q4 2014.") (citations omitted).

[180] *Id.* at 37 ("Exhibit B required WDF to collect $2.478 million related to a delay claim. The delay claim was reflected on Exhibit C in the amount of $6.043 million. The parties agree that the $2.478 million on Exhibit B was collected and that the settlement of the delay claim resulted in additional net profits in the amount of $511,929.45. Accordingly, the parties agree that Plaintiffs are entitled to a total credit of $2.99 million for this project.") (citations omitted).

[181] Tutor Perini disputes how much of the collections on this project the Sellers may credit toward the Bogey. But Tutor Perini acknowledges that at least $.241 million is attributable to Exhibit B. *See Id.* at 37–38.

[182] *Id.* at 42 ("Accordingly, WDF has collected a total of $1,562,192 on Exhibit B.") (citations omitted).

| | |
|---|---|
| Five Stations / Three Stations | $1.75 million[183] |
| Bronx Zoo | $.5 million[184] |
| 150 Amsterdam | $1.35 million[185] |
| Tallman Island (P) and (H) | $3.8 million[186] |
| Fulton Street | $.983 million[187] |
| **SUM** | **$45.047 million** |

In sum, Tutor Perini concedes the Sellers may credit at least $45.047 million toward

the Bogey.

*Remainder of Page Intentionally Left Blank*

---

[183] *Id.* at 44 ("It is undisputed that the claims on both projects were settled in February 2018 for a combined total of $1.75 million and, for that reason, Tutor Perini has given Plaintiffs credit for that amount on Exhibit B.") (citations omitted).

[184] *Id.* at 44–45 ("[I]t is true that the claim on Exhibit C settled for $500,000 in December 2015."). This project provides a concrete example of the double counting problem. *See id.* ("While it is true that the claim on Exhibit C settled for $500,000 in December 2015 [], that amount was applied against a booked position of $324,000 (for which Plaintiffs received credit on Exhibit B)[.]"). The Sellers may credit only $500,000 of collections toward the Bogey.

[185] *Id.* at 45 ("It is undisputed that WDF collected a total of $1.35 million in connection with the settlement and final close-out of the project in Q3 2017.") (citations omitted).

[186] *Id.* at 46 ("It is undisputed that the claims were settled in Q3 2018 for a total of $3.8 million.") (citations omitted).

[187] *Id.* ("A claim for $1.3 million appears on Exhibit C. It is undisputed that the claim was settled in Q3 2016 for $982,945.12.") (citations omitted).

### 2. The Sellers May Credit $10.5 Million From 156 Stations

The 156 Stations project has claim amounts listed on both Exhibits B and C.[188]

| Project | Exhibit B<br>Claims / Unbilled @ 3/31/13 | Exhibit C<br>Claim Amount |
|---|---|---|
| 156 Stations | $ 1 million[189] | $ 11.884 million |

The parties agree Greenstar has collected $10.5 million of the $11.884 million value listed on Exhibit C,[190] while the $1 million amount listed on Exhibit B remains outstanding.[191]  Despite this common ground, Tutor Perini disputes whether the Exhibit C collection meets the "net profit" requirement under the Sellers' definition.[192]  Specifically, Tutor Perini argues the Sellers should not get credit for the $10.5 million because the full amount of the Exhibit C claim was allegedly booked as revenue when the parties executed the Holdback Agreement.[193]

---

[188] Holdback Agreement at Ex. B, Ex C.

[189] The comment from Exhibit B states "reserve for possible legal costs to finalize settlement and payment to PSE."  Holdback Agreement at Ex. B.

[190] DAB at 26 (citing JX 198; JX 203; JX 208).

[191] *Id.* (citing JX 198; JX 203; JX 208; Tr. 234 (Soroka)).

[192] *Id.* at 27; Post-Trial Oral Arg. (D.I. 224) at 110.

[193] DAB at 26 (citing Tr. 546–50 (Bennett); JX 48; JX 411).  The Sellers dispute whether the full amount of the claim was booked. *See* PRB at 10 (questioning whether Defendant's evidence on this topic was properly entered into the record).  I need not reach that question because I am persuaded the Holdback Agreement unambiguously allows the Sellers to credit their actual collections on the 156 Stations project to the extent they did not overlap with collections on claims listed on Exhibit B.

Therefore, according to Tutor Perini, even under the Sellers' definition of "net profit," the $10.5 million collection could not meet the Exhibit C collection standard because it had already increased revenue when it was booked.[194] The Sellers respond by exposing that Tutor Perini's reading renders the $11.8 million claim on Exhibit C superfluous. As the Sellers correctly observe, by Tutor Perini's lights, even if Greenstar had collected the full $11.884 million listed on Exhibit C, the Sellers could never get credit for that claim.[195]

As the Sellers point out, there would be no reason to include a value on Exhibit C if it was uncollectable for purposes of reaching the Bogey under any set of facts.[196] To reiterate, the purpose of the "net profit" requirement for Exhibit C is to avoid double counting when an Exhibit C claim is inclusive of an Exhibit B claim.[197] There is no double counting problem with the 156 Stations claim listed on

---

[194] Holdback Agreement § 2.

[195] POB at 46–48; PRB at 9–10, 23–24.

[196] *See Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at * 13 (Del. Ch. Sept. 11, 2015) (declining to adopt an interpretation that "would lead to absurd results to which no reasonable person would have agreed."); *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

[197] *See, e.g.*, Holdback Agreement at Ex. B, Ex. C (Freedom Tower contained a $29.436 million Exhibit C claim which *included* a $5 million Exhibit B claim). The comments to Exhibit C clarify, "[c]laim amount settled less $5M previously recognized *will be offset amount* (*see* Exhibit B)." Holdback Agreement at Ex. C (emphasis supplied).

Exhibit B. The $1 million listed for 156 stations was a "reserve for possible legal costs to finalize settlement and payment."[198] The Exhibit C claim did *not* include the $1 million legal fees listed on Exhibit B.[199] Because there is no double counting issue, the Sellers may credit the $10.5 million they actually collected from Exhibit C toward the Bogey.

### 3. The Sellers May Credit $5 Million from Freedom Tower

Tutor Perini disputes whether a "$5 million change order [collected by Greenstar and applied toward the Bogey by the Sellers] . . . relat[ed] to the claim listed on Exhibit B and C."[200] In other words, the parties do not dispute that money came in the door in collection of this claim. The dispute lies in whether this money relates to an Exhibit B claim or to unrelated work on the Freedom Tower project.

Tutor Perini cites Ryan Soroka's trial testimony for the proposition that the $5 million receipt was unrelated to Exhibit B.[201] Specifically, Soroka testified that he "recall[ed]" that "$5 million of [] claims for Freedom Tower were paid in 2015" and that "[w]e've given credit in full" for that amount.[202] Yet credible testimony

---

[198] Holdback Agreement at Ex. B (comments for 156 Stations).

[199] DAB at 26 (citing JX 189; JX 203; JX 208).

[200] DAB at 29.

[201] *Id.*

[202] Tr. 317:9-20 (Soroka) ("Q. Right. So the $5 million of pre-Sandy claims for Freedom Tower were paid in 2015. Correct? A. That's what I recall. Q. And at that point, the

from Messrs. Tutor, Segal, Therien and Soroka reveals that Greenstar did collect the $5 million on Exhibit B.[203] With this testimony, the Sellers have proven by a preponderance of the evidence that they may credit the full $5 million toward the Bogey.

### 4. The Sellers May Credit $13.541 Million on Jamaica 2G

Tutor Perini claims the Sellers are entitled to no credit for Jamaica 2G while the Sellers argue they are entitled to credit $16.682 million.[204] Tutor Perini's litigation position contradicts its pre-litigation position, per Ron Tutor's March 2015 letter, that the Sellers could credit at least $13.541 million of $18.7 million in total collections on the Jamaica 2G project.[205] At trial, Tutor Perini attempted to walk back its previous calculation by claiming the 2015 letter represented a "best case scenario for [the Sellers]" and that the letter was unreliable on its own terms.[206] The

---

booked amount that existed as of March 2013 was collected in full. Correct? A. We've given credit in full. I can't specify that that specific $5 million was included in the $12 million which was the ultimate settlement. However, in the—for purposes of the updated exhibit, we've given credit to that regard as collected in full."). Indeed, Tutor Perini actually "give[s] credit" for the additional $5 million in its briefing. DAB at 29 n.15, Ex. 1.

[203] Tr. 498:12–13 (Tutor); Tr. 45:7–8 (Segal); Tr. 133:5–7, 135:15–17 (Therien), Tr. 317 (Soroka).

[204] *See* DAB at 38–42; PRB at 24.

[205] JX 181 at 00170.

[206] DAB at 40 (citing *Id.*).

walk back is not credible. Tutor Perini's contemporaneous memoranda—prepared in the midst of the parties' pre-litigation discussions—characterizes the $13.541 million as a "[c]ollection on [p]reviously [o]utstanding UCO's/unbilled."[207] This characterization of the collection on a clear (or at least clearer) day is credible; the Sellers are entitled to credit at least $13.541 million toward the Bogey consistent with Tutor Perini's own calculations.[208]

### 5. The Sellers May Credit $1.6 Million on John Jay

For John Jay, Tutor Perini does not dispute that the Sellers are entitled to credit $1.562 million in collections from Exhibit B.[209] The dispute centers on collections of the $1.6 million claim from Exhibit C and whether such collections properly relate to the Holdback Agreement.[210] In support of their position that this collection should be credited to Exhibit C, the Sellers point to testimony from Roman (WDF's long-time CEO) in which he confirmed that he had checked on "certain claims on John

---

[207] JX 181 at 00172. Tutor's testimony was that the credit of $13.541 million came about after "accounting's exhaustive review and my [(Ron Tutor's)] review of accounting." Tr. 474:5–6 (Tutor).

[208] Given that I find Tutor Perini must release the entire Special Holdback, I need not address the remaining disputed collections on Jamaica 2G.

[209] DAB at 42 ("WDF has collected a total of $1,562,192 on Exhibit B.").

[210] *Id.* at 43.

Jay" and had confirmed that "somewhere between $1.6 million and $1.7 million was settled."[211]

Tutor Perini attacks this testimony as "speculative" and unsupported by corroborating documents.[212] I disagree. Roman's testimony was precise and credible. And there is nothing in the record to contradict it. Accordingly, the Sellers may credit $1.6 million on the John Jay project's Exhibit C claim toward the Bogey.[213]

### 6. The Counterclaims Do Not Prevent the Sellers From Reaching the Bogey

Tutor Perini's Post-Trial Answering Brief states there are only two counterclaims remaining: Newtown Creek 31E ($9.173 million) and John Jay ($11.5 million).[214] As for John Jay, the credible testimony, particularly from Roman, indicates that this counterclaim is "gone."[215] Roman would know about this counterclaim as WDF's CEO and, again, Tutor Perini cites no persuasive evidence

---

[211] Roman Dep. 47:5–9 (D.I. 165).

[212] DAB at 43.

[213] Here, I am adopting the low-end of Roman's testimony regarding how much of the claim Greenstar collected.

[214] DAB at Ex. 1. Given how I resolve other disputes, I do not reach whether the Newtown Creek 31E counterclaim is still outstanding such that it offsets Greenstar's collections.

[215] PRB at 27; Roman Dep. at 202:21–24 (D.I. 165)).

to contradict Roman's testimony.[216]  Since the credible evidence reveals that the John Jay counterclaim is no longer outstanding, it cannot offset Greenstar's collections.

### 7. Calculating the Bogey

To require Tutor Perini to release the entire $8 million Special Holdback, the Sellers needed to prove, by a preponderance of the evidence, that Greenstar collected the Bogey ($60.529 million) after a reduction for outstanding counterclaims.[217]

---

[216] Tr. 510:8–9 (Foncello) (stating Roman is WDF's CEO).  Indeed, Tutor Perini's only attempt to rebut Roman's testimony appears in its Post-Trial Answering Brief, at footnote 26, where it states, "[t]he amount of the counterclaim has been increased to $11.5 million" without citing any evidence.  DAB at 42 n.26.  Tutor Perini's trial demonstrative (the "Amended Soroka Demonstrative") (D.I. 183) references a $11.5 million counterclaim on the John Jay project.  D.I. 183.  The only citation provided for this assertion is "status of counterclaim derived from counsel."  D.I. 183 at Ex. A.  The Amended Soroka Demonstrative is (i) not evidence and (ii) based on hearsay communications with counsel that Tutor Perini has not sought to offer into evidence.  It is not competent, therefore, to rebut the Sellers' evidence.  During post-trial oral argument, defense counsel argued Soroka's testimony established that the John Jay counterclaim still existed.  *See* Post-Trial Oral Arg. (D.I. 224) at 122–23 (citing Tr. 265 (Soroka)).  Soroka's testimony was, "If I recall that—I believe that [the John Jay counterclaim] amount is unchanged from the initial agreement."  Tr. 265 (Soroka).  I credit Roman's testimony over Soroka's for three reasons.  *First*, Roman's testimony was more definitive.  *Second*, as WDF's CEO, Roman is more likely to know the status of the counterclaim when compared to Soroka (who is removed from WDF's day-to-day operation).  Tr. 161–62 (Soroka) (Soroka joined Tutor Perini in 2011 to become Director of Technical Accounting.  He stayed in that role for two years.  He left Tutor Perini in 2013 and returned in 2015 to assume the role of Vice President of Finance Operations.  In April 2017, he became Tutor Perini's Chief Accounting Officer.).  *Third*, I find the conspicuous lack of documentary evidence on the status of the John Jay counterclaim falls at Tutor Perini's feet.  Tutor Perini cannot attack the Sellers' witness testimony as lacking in documentary support when *it* is the entity that controls the relevant documents.

[217] Holdback Agreement § 2.

The Holdback Agreement unambiguously provides that cash collections toward the Bogey can be "made up of any combination of cash receipts from Exhibits B & C."[218] The preponderance of the evidence shows the Sellers are entitled to credit:

- $45.047 million in undisputed cash collections

- $10.5 million from 156 Stations

- $5 million from Freedom Tower

- $13.541 million from Jamaica 2G

- $1.6 million from John Jay

I also find the preponderance of the evidence proves that the John Jay counterclaim is no longer outstanding—leaving only the $9.173 million counterclaim from Newtown Creek. After doing the math, the Sellers may credit $66.515 million toward the $60.529 million Bogey.[219] Because the Sellers have exceeded the Bogey, Tutor Perini must release the entire $8 million Special Holdback.[220]

---

[218] Holdback Agreement at Ex. D.

[219] $75.688 (total claims) - $9.173 (Newton Creek counterclaim) = $66.515.

[220] Given this finding, I do not address Plaintiffs' post-trial motion to strike Ryan Soroka's trial demonstrative (D.I. 188).

## III. CONCLUSION

The Sellers have proven that they are entitled to the entirety of the Special Holdback. Accordingly, final judgment will be entered for Plaintiffs on Count IV of the Complaint. The parties shall confer and submit a conforming final judgment within ten (10) days.